# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**LEODUS THOMAS,**
Plaintiff,

v.

**CITY OF CHICAGO, a municipal corporation; OFFICER RUBI and OFFICER VIJAYAGANESH, Individually and in their official capacities,**
Defendants.

Case No: 26-cv-9346

JURY DEMANDED

## COMPLAINT

Plaintiff LEODUS THOMAS, by and through his attorney, S.T. Allen Law, P.C. and for his Complaint against Defendants CITY OF CHICAGO, OFFICER RUBI, OFFICER VIJAYAGANESH, and states as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this claim occurred within the Northern District of Illinois, Eastern Division.

## PARTIES

3. Plaintiff Leodus Thomas is an adult resident of the State of Illinois. At all times relevant to this Complaint, Mr. Thomas was lawfully operating a motor vehicle within the City of Chicago, Cook County, Illinois.

4. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois. The City of Chicago is responsible for the policies, practices, supervision, training, and conduct of the Chicago Police Department and its officers, including Defendant Officers.

5. Defendant Officers Rubi and Vijayaganesh ("Defendant Officers") are duly sworn officers of the Chicago Police Department and are sued in both their individual and official capacities. At all times relevant herein, the Officers acted under color of state law and within the scope of their employment with the City of Chicago.

## FACTUAL ALLEGATIONS

6. On August 31, 2025, Plaintiff Leodus Thomas, an African American man, was lawfully operating his motor vehicle on a public roadway within the City of Chicago, Illinois.

7. Defendant Officers, without reasonable suspicion or probable cause, initiated a traffic stop of Mr. Thomas the sole basis of which was the fact that Mr. Thomas is Black and was driving a visibly expensive vehicle. Defendant Officers' decision to conduct the stop was racially motivated and constituted discriminatory, pretextual policing.

8. Officer Vijayaganesh approached the passenger side of the vehicle while Officer Rubi approached the driver's side of Mr. Thomas's vehicle with his flashlight illuminated and intentionally directed the beam of the flashlight directly into Mr. Thomas's face, causing him discomfort and impairing his vision.

9. Mr. Thomas respectfully asked Officer Rubi to redirect the flashlight out of his eyes. Officer Rubi refused, responding: "it is at where it's at." Officer Rubi's refusal was deliberately contemptuous and intended to demean and intimidate Mr. Thomas.

10. Officer Rubi then asked Mr. Thomas if he had any weapons inside the vehicle. Mr. Thomas stated that he did. Mr. Thomas is the lawful owner of this firearm, and he was in legal possession of it at all times during this encounter.

11. Despite having no objective basis to believe Mr. Thomas was reaching for the firearm or posed any threat, Officer Rubi fabricated a claim that Mr. Thomas was reaching for something dangerous. Officer Rubi used this fabricated pretext to threaten to draw his own weapon against Mr. Thomas, a law-abiding citizen exercising his lawful right to bear arms.

12. Without Mr. Thomas's consent, without probable cause, and without exigent circumstances justifying such conduct, Officer Rubi physically opened Mr. Thomas's vehicle door and, using force, pulled Mr. Thomas out of the vehicle.

13. Officer Rubi then placed Mr. Thomas in handcuffs and detained him at the scene without any lawful justification.

14. While Mr. Thomas was detained in handcuffs on a public street, Mr. Thomas exercised his right to request a supervisor. Mr. Thomas was required to wait approximately one (1) hour before a supervisory officer arrived on the scene.

15. During the extended period of his detention, and while he remained in handcuffs, Officer Rubi repeatedly asked Mr. Thomas for permission to search his person and his vehicle. Officer Rubi conditioned Mr. Thomas's release, explicitly stating that if Mr. Thomas consented to the search, Officer Rubi would allow Mr. Thomas to leave without receiving a citation. This constituted a coercive and unlawful attempt to obtain consent to search in exchange for the promise of leniency.

16. Mr. Thomas did not voluntarily and freely consent to any search of his person or vehicle.

17. When the supervisory officer arrived on the scene after approximately one hour, the supervisor asked Officer Rubi why Mr. Thomas was in handcuffs, indicating that Officer

Rubi's justification for the detention and restraint was not apparent even to a fellow police supervisor.

18.     Mr. Thomas was eventually released from handcuffs and Officer Rubi issued Mr. Thomas a citation for Disregarding a Red Light.

19.     The citation for Disregarding a Red Light was false, fabricated, and issued in bad faith. On January 9, 2026, the citation against Mr. Thomas was dismissed, confirming that there was no valid legal basis for the charge.

20.     As a direct and proximate result of Defendants' actions, Mr. Thomas has suffered physical discomfort, fear, humiliation, emotional distress, mental anguish, loss of dignity, loss of liberty, and other damages.

## CPD'S POLICY, PATTERN, AND PRACTICE OF UNCONSTITUTIONAL, RACIALLY DISCRIMINATORY TRAFFIC STOPS, ESCALATORY CONDUCT, AND FAILURE TO DISCIPLINE OFFICERS WHO FABRICATE CHARGES

21.     Defendant Officers' unlawful, racially motivated, and pretextual stop of Mr. Thomas was not an isolated incident. It was the direct and foreseeable product of long-standing, City-sanctioned policies, practices, and customs governing the Chicago Police Department's ("CPD") approach to traffic enforcement, use of force, and officer accountability, as set forth below.

### A. CPD Operates a Mass Traffic Stop Program That Targets Black Drivers on the Basis of Race.

22.     For at least a decade, CPD has operated what is commonly referred to, including by outside monitors, as a "Mass Traffic Stop Program," under which officers are directed, incentivized, and in some instances required to meet numerical quotas for traffic stops.

23.     According to data CPD reports to the Illinois Department of Transportation ("IDOT"), CPD's total number of traffic stops increased from approximately 83,000 in 2014 to approximately 500,000 in 2022 -- more than a five-fold increase -- even as total traffic stops statewide, excluding CPD, remained essentially flat over the same period.

24.     Despite this massive increase in stops, CPD's citation rate has collapsed. In 2015, CPD officers issued citations in more than 65% of traffic stops. By 2022, that figure had fallen to just 3.4%. Fewer than 1% of CPD traffic stops result in the recovery of contraband. This data confirms that the overwhelming majority of CPD traffic stops -- including the stop of Mr. Thomas -- are pretextual, undertaken not to enforce traffic laws but to investigate unrelated suspicions based on discriminatory assumptions about race.

25.     CPD's own data, and data compiled by independent researchers and oversight bodies, confirms that this Mass Traffic Stop Program is applied in a racially discriminatory manner. A 2024 report by Impact for Equity and the Free to Move Coalition found that in 2023, Black drivers comprised 51.2% of all persons stopped by CPD, despite comprising less than 29% of Chicago's population. White drivers, by contrast, make up approximately

32.7% of Chicago's population but accounted for only 13.6% of CPD traffic stops that same year.

26. The City of Chicago's own Office of Inspector General ("OIG"), in a 2022 report analyzing CPD data from 2017 through 2020, concluded that Black people were stopped by CPD, and subjected to police force once stopped, at rates far exceeding their share of the population, and that this disparity persisted across CPD Districts and could not be explained by differences in reported crime rates.

27. The Chicago Police Accountability Task Force ("PATF"), in its April 2016 report, found that in 2013 alone, Black people accounted for 46% of the 100,676 traffic stops conducted by CPD, compared to 27% for white people. PATF further found that CPD searched Black and Hispanic drivers approximately four times as often as white drivers, even though CPD's own data showed that contraband was recovered from white drivers twice as often as from Black and Hispanic drivers -- objective proof that CPD's disproportionate targeting of Black drivers, like Mr. Thomas, is not justified by any legitimate law-enforcement rationale.

28. The United States Department of Justice's January 2017 investigation of CPD reached similar conclusions, finding that CPD engages in a pattern of racial profiling and that CPD's tactical ("Tact") teams and other specialized units operate with a "hunting" mentality, patrolling in plainclothes and unmarked vehicles to target Black and Latino neighborhoods for stops untethered to individualized, race-neutral suspicion.

29. CPD leadership has directly encouraged this pattern by pressuring commanders and supervisors to increase the volume of traffic stops. Internal CPD emails from 2020, produced in related litigation, document City and CPD supervisors instructing district commanders that traffic stop totals were "not sufficient" and directing that a district "should be leading the city (Districts) in stops." Upon information and belief, this quota-driven approach to traffic enforcement remained City policy and practice in 2026, when Defendant Officers stopped Mr. Thomas because he is Black and was driving a vehicle officers perceived to be expensive.

30. Despite operating under a federal Consent Decree since 2019 that requires CPD to eliminate racially discriminatory policing, the Consent Decree's Independent Monitoring Team has repeatedly found CPD out of compliance with the substantial majority of its obligations, including provisions prohibiting officers from using race in making "routine or spontaneous law enforcement decisions" and requiring training and supervision sufficient to prevent racial profiling. As of the Monitor's most recent comprehensive assessment, CPD had failed to fully comply with 94% of all Consent Decree requirements.

### B. CPD Has a Pattern and Practice of Unlawfully Pointing Firearms at and Threatening Deadly Force Against Civilians During Routine Traffic Stops.

31. CPD's own reported data shows that Chicago police officers point firearms at civilians, including during traffic stops, at an alarming and increasing rate. CPD officers pointed firearms at people more than 3,500 times in 2022 alone -- an average of nearly ten times per day -- and CPD's own tracking showed a 19% increase in gun-pointing incidents from 2022 to 2023, following a 22% increase the year before.

32. This pattern falls disproportionately on Black Chicagoans. A representative community survey conducted for the Consent Decree Independent Monitoring Team found that young Black men reported having had a Chicago police officer point a gun at them at a rate more than five times higher than the rate reported by Chicagoans overall.

33. The Seventh Circuit has long held that it is objectively unreasonable for an officer to point a loaded firearm at a person the officer has no reason to suspect has committed any crime. See *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000). Notwithstanding this clearly established law, CPD has failed to adopt or enforce policies sufficient to curb officers' practice of drawing or threatening firearms as a first response, rather than a last resort, during traffic stops -- the very type of conduct Officer Rubi engaged in when he fabricated a basis to threaten deadly force against Mr. Thomas, a lawful firearm owner who posed no threat to Officer Rubi or anyone else.

### C. CPD Maintains a "Code of Silence" and Fails to Discipline Officers Who Fabricate Charges and Coerce Civilians.

34. CPD has long maintained what City officials, CPD supervisors, and federal investigators alike have described as a "code of silence" -- an institutionalized practice under which officers decline to report, and the Department declines to meaningfully investigate or discipline, misconduct by fellow officers, including the fabrication of charges and falsification of reports.

35. The DOJ's 2017 investigation concluded that this code of silence is "strong enough to incite officers to lie even when they have little to lose by telling the truth," because officers reasonably believe CPD will not hold them accountable. A federal jury reached a similar conclusion in Obrycka v. City of Chicago, No. 07-CV-2372 (N.D. Ill.), finding that the City had a widespread custom of failing to investigate and discipline its officers.

36. Consistent with this practice, and upon information and belief, the City has repeatedly failed to meaningfully discipline officers, including Defendant Officer Rubi, who fabricate the basis for traffic stops, detentions, and citations, or who coerce civilians into surrendering their constitutional rights through threats and conditional promises of leniency. According to the Citizens Police Data Project, more than 8,000 CPD officers have accumulated ten or more misconduct complaints, and independent oversight bodies have repeatedly found that a small fraction of the force accounts for a disproportionate share of sustained misconduct complaints -- with little corresponding discipline.

37. The Consent Decree's Independent Monitor has likewise found that the City has failed to reach compliance with the substantial majority of Consent Decree provisions designed to end the code of silence and hold officers accountable for dishonesty, fabricated charges, and coercive conduct.

38. As a direct result of these policies, practices, and customs, City and CPD policymakers have created an environment in which officers such as Officer Rubi reasonably believe they may target a driver because of his race, fabricate a pretext to threaten deadly force, coerce consent to a search by conditioning a civilian's release on that consent, detain a civilian without legal justification, and issue a fabricated citation -- secure in the knowledge that CPD will not meaningfully investigate or discipline that conduct.

39. Each of the policies, practices, and customs described in this section was a moving force behind, and a direct and proximate cause of, the violations of Mr. Thomas's constitutional rights described in this Complaint.

## CLAIMS FOR RELIEF

### COUNT I
### Unreasonable Seizure — Against Officer Rubi

40. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

41. Officer Rubi stopped Mr. Thomas's vehicle without reasonable suspicion or probable cause. The stop was initiated solely on account of Mr. Thomas's race and his operation of an expensive vehicle, in violation of the Fourth Amendment's prohibition on unreasonable seizures and the Fourteenth Amendment's guarantee of equal protection.

42. As a direct and proximate result of this unlawful stop, Mr. Thomas suffered the damages described herein.

### COUNT II
### Unlawful Detention — Against Officer Rubi

43. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

44. Officer Rubi removed Mr. Thomas from his vehicle by force, handcuffed him, and detained him for approximately one hour without probable cause to arrest, without a warrant, and without any lawful justification. This constituted an unlawful seizure of Mr. Thomas's person in violation of the Fourth Amendment.

45. The fabrication of the claim that Mr. Thomas was reaching for his firearm was a knowing falsehood devised to manufacture a pretextual justification for the seizure.

46. As a direct and proximate result of this unlawful detention, Mr. Thomas suffered the damages described herein.

### COUNT III
### Excessive Force — Against Officer Rubi

47. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

48. Officer Rubi used unreasonable and excessive force against Mr. Thomas by: (a) intentionally directing a flashlight beam into Mr. Thomas's face and refusing to redirect it despite Mr. Thomas's request; (b) forcibly opening Mr. Thomas's vehicle door without consent; and (c) physically removing Mr. Thomas from his vehicle by force despite the absence of any threatening conduct by Mr. Thomas. Such force was objectively unreasonable under the circumstances in violation of the Fourth Amendment.

49. As a direct and proximate result of this excessive force, Mr. Thomas suffered the damages described herein.

## COUNT IV
### Unlawful Search — Against Officer Rubi

50. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

51. While Mr. Thomas was restrained in handcuffs and detained without probable cause, Officer Rubi repeatedly attempted to obtain Mr. Thomas's consent to search his vehicle and person. Officer Rubi conditioned Mr. Thomas's release on his consent to the search. Any purported consent obtained under such coercive circumstances was not free and voluntary and would have violated the Fourth Amendment.

52. Officer Rubi's conduct constituted an attempt to effect an unconstitutional search by exploiting an unlawful detention to coerce consent.

53. As a direct and proximate result of this conduct, Mr. Thomas suffered the damages described herein.

## COUNT V
### Malicious Prosecution (Illinois State Law) — Against Officer Rubi

54. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

55. Officer Rubi, acting with malice and without probable cause, issued a fabricated citation against Mr. Thomas for Disregarding a Red Light as a pretext to justify the unlawful stop and detention.

56. This prosecution was commenced and continued without probable cause. On January 9, 2026, the State dismissed the citation, constituting a termination of the proceedings in Mr. Thomas's favor.

57. As a direct and proximate result of this malicious prosecution, Mr. Thomas suffered the damages described herein.

## COUNT VI
### Failure to Intervene (42 U.S.C. § 1983) — Against Officer Vijayaganesh

58. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

59. A law enforcement officer who is present and fails to intervene to prevent a fellow officer's use of excessive force, unlawful seizure, or other violation of a citizen's constitutional rights may be held liable under 42 U.S.C. § 1983 where the officer had reason to know that such a constitutional violation was being committed and had a realistic opportunity to intervene to prevent it.

60. Officer Vijayaganesh was present at the scene throughout Officer Rubi's unlawful stop, detention, and coercion of Mr. Thomas, including when Officer Rubi refused to redirect

his flashlight from Mr. Thomas's face, fabricated a claim that Mr. Thomas was reaching for a dangerous object, threatened to draw his firearm against Mr. Thomas, forcibly removed Mr. Thomas from his vehicle, placed him in handcuffs, detained him for approximately one hour without lawful justification, and repeatedly attempted to coerce Mr. Thomas's consent to a search by conditioning his release upon it.

61. Officer Vijayaganesh had reason to know that Officer Rubi's conduct violated Mr. Thomas's constitutional rights and had a realistic opportunity to intervene to prevent or curtail that conduct, including by directing Officer Rubi to redirect his flashlight, by contradicting Officer Rubi's fabricated basis for the stop and detention, by refusing to permit the continued unlawful detention of Mr. Thomas, and by declining to participate in or acquiesce to Officer Rubi's coercive attempts to obtain consent to search.

62. Despite having a realistic opportunity to do so, Officer Vijayaganesh failed to intervene to prevent Officer Rubi's unconstitutional conduct toward Mr. Thomas.

63. As a direct and proximate result of Officer Vijayaganesh's failure to intervene, Mr. Thomas suffered the damages described herein.

## COUNT VII
### Municipal Liability — Monell — Pattern and Practice of Unconstitutional, Racially Discriminatory Traffic Stops — Against the City of Chicago

64. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

65. This Count is alleged against Defendant City of Chicago.

66. At all times relevant, the City of Chicago and CPD maintained a widespread policy, pattern, practice, and custom of conducting racially discriminatory, pretextual traffic stops targeting Black motorists, including the operation of a Mass Traffic Stop Program that imposes numerical quotas on officers and disproportionately targets Black drivers, as more fully described above.

67. This pattern and practice existed for years prior to the stop of Mr. Thomas and was well documented by, among others, the DOJ (2017), PATF (2016), the City's own Office of Inspector General (2022), Impact for Equity and the Free to Move Coalition (2023-2024), and the Consent Decree Independent Monitoring Team.

68. The City and CPD knew or should have known of this pattern and practice and the constitutional violations it caused, yet failed to take reasonable steps to eliminate it, including by failing to bring CPD into compliance with the impartial-policing provisions of its own federal Consent Decree.

69. This widespread policy, pattern, and practice was a moving force behind, and directly and proximately caused, Defendant Officers' decision to stop Mr. Thomas without reasonable suspicion or probable cause based on his race and the vehicle he was driving.

70. As a direct and proximate result of the City's unconstitutional policies, patterns, and practices, Mr. Thomas suffered the damages described herein.

## COUNT VIII
### Municipal Liability — Monell — Pattern and Practice of Unlawful Gun-Pointing and Escalatory Force — Against the City of Chicago

71. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

72. This Count is alleged against Defendant City of Chicago.

73. At all times relevant, the City of Chicago and CPD maintained a widespread policy, pattern, practice, and custom of officers unlawfully pointing and threatening the use of firearms against civilians as a first response, rather than a last resort, during routine and low-level encounters such as traffic stops, as more fully described above.

74. This pattern and practice was well documented by CPD's own reported use-of-force data showing thousands of gun-pointing incidents annually and year-over-year increases, as well as by the Consent Decree Independent Monitoring Team's findings regarding the inadequacy of CPD's firearm-pointing reporting and supervision requirements.

75. The City and CPD knew or should have known of this pattern and practice, yet failed to adopt, train on, or enforce policies sufficient to prevent officers from threatening deadly force absent an objectively reasonable basis to believe such force was necessary.

76. This widespread policy, pattern, and practice was a moving force behind, and directly and proximately caused, Officer Rubi's decision to fabricate a pretext and threaten to draw his firearm against Mr. Thomas notwithstanding the absence of any objectively reasonable basis to believe Mr. Thomas posed a threat.

77. As a direct and proximate result of the City's unconstitutional policies, patterns, and practices, Mr. Thomas suffered the damages described herein.

## COUNT IX
### Municipal Liability — Monell — Failure to Train, Supervise, and Discipline; Code of Silence — Against the City of Chicago

78. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

79. This Count is alleged against Defendant City of Chicago.

80. A municipality's failure to train, supervise, or discipline its officers supports liability under 42 U.S.C. § 1983 where that failure amounts to deliberate indifference to the constitutional rights of persons with whom officers come into contact.

81. At all times relevant, the City of Chicago and CPD maintained a widespread policy, pattern, practice, and custom of failing to meaningfully investigate, supervise, or discipline officers who fabricate the basis for stops and citations, coerce consent through threats and conditional promises of leniency, and otherwise engage in dishonest or unconstitutional conduct -- a practice commonly known within and outside CPD as the "code of silence."

82. This pattern and practice was documented by the DOJ's 2017 investigation, by a federal jury's findings in Obrycka v. City of Chicago, No. 07-CV-2372 (N.D. Ill.), by the Citizens Police Data Project's records showing thousands of CPD officers with substantial unresolved complaint histories, and by the Consent Decree Independent Monitoring Team's findings of continued noncompliance with the Decree's accountability provisions.

83. The City knew that its officers, including Defendant Officer Rubi, required additional and more effective training, supervision, and discipline regarding the constitutional requirements for traffic stops, detentions, and searches, and regarding honesty in official reports and citations, yet the City's indifference to this need persisted.

84. This failure to train, supervise, and discipline, and the resulting code of silence, was a moving force behind, and directly and proximately caused, Officer Rubi's fabrication of a pretext to detain Mr. Thomas, his coercive attempt to extract consent to search in exchange for leniency, and his issuance of a fabricated citation, secure in the belief that such conduct would not be investigated or punished.

85. As a direct and proximate result of the City's deliberate indifference and unconstitutional policies, patterns, and practices, Mr. Thomas suffered the damages described herein.

## COUNT X
### False Imprisonment (Illinois State Law) — Against Officer Rubi

86. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

87. Under Illinois law, false arrest and false imprisonment occur where a defendant unreasonably restrains a plaintiff's freedom of movement against his will, without reasonable grounds to believe that the plaintiff has committed an offense.

88. Officer Rubi, acting under color of law and within the scope of his employment with the City of Chicago, forcibly removed Mr. Thomas from his vehicle, placed him in handcuffs, and detained him for approximately one hour without reasonable grounds to believe Mr. Thomas had committed any offense or posed any threat.

89. Officer Rubi's restraint of Mr. Thomas was unlawful, unreasonable, and without his consent.

90. As a direct and proximate result of this unlawful restraint, Mr. Thomas suffered the damages described herein.

## COUNT XI
### Battery (Illinois State Law) — Against Officer Rubi

91. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

92. Under Illinois law, a battery occurs where a defendant makes unauthorized, harmful, or offensive physical contact with the plaintiff's person.

93. Officer Rubi, acting under color of law and within the scope of his employment with the City of Chicago, made harmful and offensive physical contact with Mr. Thomas without his consent and without legal justification when he forcibly opened Mr. Thomas's vehicle door, physically pulled Mr. Thomas from the vehicle, and placed him in handcuffs.

94. Officer Rubi's physical contact with Mr. Thomas was neither privileged nor legally justified, as it was predicated on a fabricated and pretextual basis.

95. As a direct and proximate result of this battery, Mr. Thomas suffered the damages described herein.

## COUNT XII
### Assault (Illinois State Law) — Against Officer Rubi

96. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

97. Under Illinois law, an assault occurs where a defendant, through an unlawful, intentional threat or offer of corporal injury, coupled with an apparent present ability to carry out the threat, causes a reasonable apprehension of imminent battery.

98. Officer Rubi, acting under color of law and within the scope of his employment with the City of Chicago, fabricated a claim that Mr. Thomas was reaching for a dangerous object and, on that pretextual basis, threatened to draw his own firearm against Mr. Thomas, who was unarmed at the time of the threat and posed no threat to Officer Rubi or anyone else.

99. Officer Rubi's threat, made by an armed police officer with the apparent and actual present ability to carry it out, placed Mr. Thomas in reasonable apprehension of imminent and unlawful use of deadly force against him.

100. As a direct and proximate result of this assault, Mr. Thomas suffered the damages described herein.

## COUNT XIII
### Intentional Infliction of Emotional Distress (Illinois State Law) — Against Officer Rubi

101. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

102. Under Illinois law, a defendant is liable for intentional infliction of emotional distress where his conduct is extreme and outrageous, he intends to cause severe emotional distress or knows there is a high probability his conduct will do so, and his conduct in fact causes severe emotional distress.

103. Officer Rubi's conduct -- including intentionally shining a flashlight into Mr. Thomas's eyes and refusing to redirect it, fabricating a claim that Mr. Thomas was reaching for a dangerous object, threatening to draw his firearm against an unarmed and compliant civilian, forcibly removing Mr. Thomas from his vehicle, detaining him in handcuffs on a public street for approximately one hour, coercing him for consent to search by conditioning his release on that consent, and issuing him a fabricated citation -- was extreme and outrageous conduct exceeding all bounds of decency tolerated in a civilized

society, particularly given the abuse of Officer Rubi's position of authority over Mr. Thomas.

104. Officer Rubi knew or should have known that this course of conduct was highly likely to cause Mr. Thomas severe emotional distress.

105. As a direct and proximate result of Officer Rubi's extreme and outrageous conduct, Mr. Thomas suffered severe emotional distress, fear, humiliation, and mental anguish.

## COUNT XIV
### Violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 — Against the City of Chicago

106. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

107. The Illinois Civil Rights Act of 2003 provides that no unit of state, county, or local government shall subject a person to discrimination on the basis of race in any of its programs, activities, or services, including law enforcement.

108. As set forth above, the City of Chicago and CPD maintained a policy, pattern, and practice of racially discriminatory traffic enforcement, including the Mass Traffic Stop Program, which subjects Black motorists such as Mr. Thomas to stops, detentions, and use of force at rates grossly disproportionate to their share of Chicago's population and without any legitimate, race-neutral justification.

109. Defendant Officers stopped, detained, and used the threat of force against Mr. Thomas because of his race, pursuant to and as a direct result of the City's policies, patterns, and practices described above.

110. As a direct and proximate result of the City's racially discriminatory policies, patterns, and practices, Mr. Thomas suffered the damages described herein.

## COUNT XV
### Respondeat Superior (Illinois State Law) — Against the City of Chicago

111. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

112. At all times relevant, Officer Rubi was employed by the City of Chicago and was acting within the scope of that employment and under color of law.

113. Under the doctrine of respondeat superior, the City of Chicago is vicariously liable for the state-law torts committed by Officer Rubi as alleged in Counts V and X through XIII above, which were committed within the scope of his employment as a Chicago police officer.

## COUNT XVI
### Indemnification, 745 ILCS 10/9-102 — Against the City of Chicago

114. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

115. At all times relevant, Officer Rubi and Officer Vijayaganesh were employees of the City of Chicago, acting within the scope of their employment.

116. Illinois law, 745 ILCS 10/9-102, requires a local public entity such as the City of Chicago to pay any tort judgment, including for compensatory damages, attorneys' fees, and costs, for which an employee is liable arising from an act within the scope of his employment.

117. Should Officer Rubi and/or Officer Vijayaganesh be found liable on any of the federal or state-law claims alleged herein, including the failure to intervene claim against Officer Vijayaganesh in Count VI, the City of Chicago is statutorily obligated to indemnify them for any resulting judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Leodus Thomas respectfully requests that this Court:

(a) Enter judgment in Plaintiff's favor and against all Defendants on all Counts;

(b) Award Plaintiff compensatory damages in an amount to be determined at trial for the physical discomfort, fear, humiliation, emotional distress, mental anguish, loss of dignity, loss of liberty, and all other damages suffered as a result of Defendants' unconstitutional conduct;

(c) Award Plaintiff punitive damages against the individual Defendant Officers in an amount sufficient to punish and deter such unconstitutional conduct;

(d) Award Plaintiff his reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

(e) Grant such other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiff Leodus Thomas hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Shay T. Allen*
Shay T. Allen

S.T. Allen Law, P.C.
314 N. Loomis St., Suite G2
Chicago, Illinois 60607
708.960.0113
sallen@attorneyshaytallen.com